# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSEF K., ET AL.,**<br>Plaintiffs,<br>vs.<br>**CALIFORNIA PHYSICIANS' SERVICE, ET AL.,**<br>Defendants. | CASE NO. 18-cv-06385-YGR<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 89, 90, 92, 94, 96, 108 |

Now before the Court are cross-motions for judgment brought by plaintiffs Josef K. and E.K and defendants California Physicians Service dba Blue Shield of California ("Blue Shield"), TriNet Group, Inc. and the TriNet Blue Shield PPO 500 Group #977103 Plan (collectively, "TriNet"), and Maximus Federal Services, Inc. ("Maximus"), arising out of the denial of mental health care benefits under a plan governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*. Plaintiffs bring causes of action for recovery of benefits due under ERISA as to Blue Shield and TriNet and breach of fiduciary duty as to Maximus.

Having considered the parties' briefing, the administrative record,[1] and the oral arguments of the parties, the Court hereby **ORDERS** that plaintiffs' motion is **DENIED**, Blue Shield and TriNet's cross-motion is **GRANTED**, and Maximus' cross-motion is **GRANTED**.

---

[1] The unopposed administrative motions to seal (1) the administrative record; (2) the name of the physicians who reviewed E.K.'s claims; and (3) portions of the briefs referencing (1) and (2) are GRANTED. (Dkt. Nos. 89, 94, 96, 108.) As to the administrative record, the Court finds that it contains highly confidential medical information and there is no less restrictive means to protect E.K.'s privacy interests. As to the physician names, the Court notes that California Health and Safety Code section 1374.33(e) provides that entities performing IMRs "shall keep the names of reviewers confidential . . . except in response to court orders." Here, given the default of the statute to keep such names confidential and a lack of opposition to the administrative motions, sealing is proper.

## I. FACTUAL BACKGROUND

### A. Plan Terms

Effective October 1, 2014, plaintiff E.K., through her father, plaintiff Josef K., was covered under a group health plan issued by Blue Shield ("the Plan"). Under the terms of the Plan, treatment is covered only if it is "Medically Necessary," defined in relevant part as follows:

> 1. Services which are medically necessary include only those which have been established as safe and effective, are furnished under generally accepted professional standards to treat illness, injury or medical condition, and which, as determined by Blue Shield, are:
>
>   a. consistent with Blue Shield of California medical policy;
>
>   b. consistent with the symptoms or diagnosis;
>
>   c. not furnished primarily for the convenience of the patient, the attending Physician or other provider; and
>
>   d. furnished at the most appropriate level which can be provided safely and effectively to the patient.
>
> 2. If there are two or more medically necessary services that may be provided for the illness, injury or medical condition, Blue Shield will provide benefits based on the most cost-effective service.

Blue Shield "reserves the right to review all claims to determine if a service or supply is medically necessary" and "may use the services of Doctor of Medicine consultants, peer review committees of professional societies or Hospitals and other consultants to evaluate claims." The Plan further provides that if Blue Shield determines services are not medically necessary, it "may limit or exclude benefits for [those] services."

### B. E.K.'s Medical History

The administrative record evidences E.K.'s difficult history of behavioral issues, mental health diagnoses, and treatment. In 2009, when she was about seven years old, E.K. was diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder (ADHD). In 2012, doctors diagnosed E.K. with Asperger Syndrome and autism. A school evaluation from the same year described E.K.'s struggles in the academic setting, including her placement on an individualized educational program, multiple suspensions due to behavioral incidents, and a recommendation from the school district that E.K. leave the general education setting "due to severe emotional and behavioral needs." Despite these difficulties, the evaluation recommended

that E.K. first be given the opportunity to try appropriate interventions in the general education setting, including, among other things, one-on-one support in the classroom and individual and family counseling, as well as a social skills training program and other treatments for individuals with autism spectrum disorder. At age 11, E.K. began treatment for ADHD and entered individual and family therapy.

E.K. experienced her first psychiatric hospitalization in June 2014, at which time she was placed on an involuntary hold for 72 hours under California Welfare and Institutions Code Section 5150 ("Section 5150"). The next month, E.K. again was taken to the emergency room after she put a knife to her mouth and made comments about harming herself and others. At the time, E.K. was meeting weekly with a psychologist and seeing a psychiatrist but "refusing" to take any medication. E.K.'s therapist had "referred the family to call consultants about potential facilities" in which to place her. E.K.'s mother had conveyed that she was "worn out" and was "concerned she [wa]s going to become angry and hit the child," although she had resisted sending her to a facility. Hospital records describing the attending physician's impressions noted E.K.'s "refusal to take medications," "[c]oncerning gestures with a knife," "depression," and "suicidal ideation[s]." However, E.K. disputed that she was suicidal and advised doctors that she had put a knife to her mouth and made certain remarks to upset her parents and make her brother and his friend leave. E.K. was referred for a psychiatric evaluation and placed on a Section 5150 hold for 72 hours.

The following year, in April 2015, E.K. received another special education assessment and psycho-educational report from her school district. The school psychologist's report noted improvements in E.K.'s behavior but also stated that E.K. had resumed cutting herself, vandalized a desk, grabbed another student's arm, defied school authority, used profanity towards a teacher, and threatened another student by saying, "I'm going to kill you." E.K.'s science teacher reported that she did not "feel very 'safe' with [E.K.] in the classroom" and that E.K.'s behavior made others in the classroom feel unsafe. The reports noted that E.K. was seeing a psychologist for cognitive behavioral therapy and was also receiving weekly school-based counseling. The reports recommended, among other things, that E.K. continue with counseling and be placed in general education classes with added support.

3

1  Thereafter, E.K.'s parents began discussing with her therapists alternative forms of
2  treatment, including residential treatment. E.K.'s parents also met with Bodin Consulting, a
3  placement service for residential treatment centers.

**C.  E.K.'s Treatment at Aspiro (September 12, 2015 to December 1, 2015)**

Approximately five months later, on September 12, 2015, E.K. began receiving residential treatment at the Aspiro Wilderness Program. E.K.'s master treatment plan at Aspiro noted that she suffered from "depression, withdrawal, anger, isolation, poor coping and emotional regulation, [and] social difficulty" and that she "struggled with 'rigid thinking, being inflexible, volatile, and socially way behind her peers.'" The plan also stated that E.K. "display[ed] a large amount of anger at home," had a "history" of self-harm, frequently expressed about suicidal ideations, and demonstrated symptoms of anxiety. The plan addressed interventions Aspiro would use to address E.K.'s issues, including, among other things, weekly group therapy and individual therapy, as well as "Group Oriented Outdoor Adventure Education at least 5 days a week."

E.K. was discharged approximately three months later. Her discharge summary, completed by two social workers who treated E.K. at Aspiro, noted that she had improved during her stay. However, it also stated that E.K. still suffered from major depressive disorder, unspecified anxiety disorder, and autism spectrum disorder. The discharge summary "strongly recommended" placement at a "residential treatment center," which Aspiro recommended "over her returning home because of the likelihood that she would fall into self-destructive behaviors." The report explained that residential treatment would provide E.K. with individual, group, and family therapy, as well as access to a solid academic curriculum, supportive peers, and mood regulation therapies.

**D.  E.K.'s Treatment at Maple Lake (December 1, 2015 to December 15, 2016)**

Immediately following her treatment at Aspiro, E.K.'s parents enrolled her in another residential treatment program at Maple Lake Academy. E.K.'s master treatment plan from Maple Lake discussed long-term goals as well as short-term objectives and interventions, including, among other things, daily group therapy, weekly family and individual therapy, and social, group, and leisure education and experiential sessions.

4

1   Maple Lake's treatment notes describe E.K. as, at various times, tearful, isolated, and
2   disheveled.  E.K. told therapists that "over the past two years [she] had become increasingly
3   angry, sad, avoidant, provocative, prone to angry outbursts" and "often los[t] [her] temper."  She
4   further reported "shak[ing] with anxiety," "feel[ing] dizzy and lightheaded at times," "[having]
5   heart palpitations," "ma[king] suicidal threats," and experiencing "shortness of breath."  Records
6   show that E.K. continued to experience anxieties related to food.  Further, although E.K.
7   occasionally took psychiatric medication at Maple Lake, she also expressed resistance.  In October
8   2016, E.K.'s parents discussed with therapists their decision to have E.K. return home.  E.K. left
9   Maple Lake on December 15, 2016.

### E. Blue Shield's Denials of E.K.'s Aspiro Claims

#### *1. Initial Review by Blue Shield*

After E.K. was discharged from Aspiro, plaintiffs submitted claims to Blue Shield for her treatment.  Internal notes state that Blue Shield's Director of Behavioral Health reviewed "the claim, levels of care billed, MCG Care Guidelines, and medical records," and denied the claim.  The notes state that Aspiro did not "provide the services of a residential program as expected but instead was a wilderness experience program with academic and some clinical features."  Additionally, the reviewer found "no indication [] that [E.K.'s] care could not be provided safely and effectively in a setting less restrictive than a residential treatment setting," like an "intensive outpatient program," which would "help [E.K.] stabilize sufficiently for longer term traditional outpatient care."  These denials were communicated to plaintiffs through multiple "explanation of benefits" letters.

#### *2. Plaintiffs' Appeal and Review by Blue Shield and AMR*

On July 13, 2016, plaintiffs appealed to Blue Shield.  In response, Blue Shield completed an internal clinical case review form, citing to and quoting from E.K.'s Aspiro discharge summary and clinical progress notes.  Additionally, on September 7, 2016, Blue Shield referred E.K.'s case to an independent third party, Advanced Medical Reviews ("AMR").  The same day, a psychiatrist from AMR evaluated the medical necessity of E.K.'s stay at Aspiro.  AMR's report summarized E.K.'s clinical background:

> The patient is a 14 year old female. The patient presents with major depression, anxiety and autism spectrum disorder. The patient was admitted to residential mental health treatment on 9/12/15. She had symptoms of anger, suspiciousness, anxiety, social isolation, preoccupation with electronic devices, argumentativeness, tantrums, past superficial skin cutting (last cutting occurring in the spring,) allegedly harassing a teacher at school, and reporting suicidal thoughts at times. Her medications are sertraline. The progress notes provided for review documents the absence of suicidal and homicidal ideation. There was no reported ongoing self-harming, psychosis, physical aggression, or significant impairment in the activities of daily living (ADLs).

AMR then considered E.K.'s claims based on various criteria, which Blue Shield's briefing identifies as the Magellan Guidelines, as well as "current peer-reviewed literature" and "national guidelines." With respect to the Magellan Guidelines, among other findings, AMR concluded that there was not a high degree of potential that E.K.'s condition would lead to psychiatric hospitalization absent residential treatment; there was no clinical evidence of risk to E.K. or others; there was no requirement of 24/7 supervision; and there was no indication that E.K.'s living environment lacked support and access to therapeutic services. With respect to the criteria set forth in the medical literature, AMR found an absence of suicidal or homicidal ideations, self-harming behaviors, serious physical aggression, impairment in the activities of daily living, out-of-control behavioral issues that could not be managed in partial hospitalization, or comorbid medical conditions and mental health symptoms. AMR concluded that E.K.'s treatment at Aspiro was not medically necessary.

In a letter dated September 8, 2016 and signed by Blue Shield's appeals and grievance department medical director, Dr. David Ocepek, Blue Shield advised plaintiffs of the denial. Dr. Ocepek explained that the claim had been reviewed by a board-certified psychiatrist and a Blue Shield medical director, with assistance from a registered nurse. The letter stated that E.K. did not meet "the Blue Shield of California/MHSA guidelines for treatment at a residential program since [E.K.'s] mental health issues had not caused significant impairment that could not be managed at a lower level of care" and "[c]are outside of a residential setting would not cause a serious or imminent danger to [E.K.] or to others." The letter attached the AMR report in its entirety. It further explained that E.K. was "entitled to, upon request and free of charge, reasonable access to, and copies of all documents, records, and other information relevant to [her] claim for benefits"

1    and, specifically, that E.K. could "request a copy of clinical criteria [or] clinical guidelines . . .

2    involved in the plan's decision."

### 3. *Independent Medical Review by Maximus*[2]

Plaintiffs next submitted a request for an independent medical review ("IMR") to Blue Shield's regulator, the Department of Managed Health Care ("DMHC"). In their letter to the DMHC, plaintiffs claimed that Blue Shield had failed to (1) identify the names and qualifications of all reviewers who conducted reviews and (2) provide specific references to the records relied upon in reaching its denial. Plaintiffs also disputed the finding that E.K. did not meet the Magellan Guidelines criterion of "serious or imminent danger," highlighting records showing that E.K. had threatened students and cut herself in the past. Plaintiffs further disputed that E.K. did not meet the criterion of "significant impairment," claiming that "all lower levels of care had been tried with absolutely no positive outcome."

Additionally, plaintiffs submitted supplemental documentation, including two letters of medical necessity from E.K.'s treating doctors, Dr. Yvette Tazeau and Dr. Brian Kleis. Dr. Tazeau's July 2, 2016 letter stated that she began seeing E.K. on October 27, 2014. E.K.'s family had participated in 13 therapy sessions over five months, concluding with a session on March 24, 2015. Dr. Tazeau noted that E.K. had been diagnosed with Obsessive Compulsive Disorder and Generalized Anxiety Disorder. The letter stated that E.K.'s behavioral difficulties at home and at school "had not abated into the Spring of 2015, and at that time, [Dr. Tazeau and E.K.'s parents] discussed other forms of treatment, including residential treatment, as they can be beneficial because of their round-the-clock interventions, including behavior modifications." The letter further noted that E.K.'s parents had met with Bodin Consulting regarding placement in a residential treatment setting. Dr. Kleis' July 14, 2016 letter stated that he first evaluated E.K. in

---

[2] The legislature created the IMR process to provide health plan enrollees who are not satisfied with the decisions of their health plans the opportunity to appeal those decisions directly to the regulator. Cal. Health & Saf. Code §§ 1374.30(b), (d). The IMR review need not be based on the health plan's medical necessity criteria, but rather, "shall determine whether the disputed health care service was medically necessary based on the specific medical needs of the [enrollee] and . . . (1) Peer reviewed scientific and medical evidence[.] (2) Nationally recognized professional standards. (3) Expert opinion. (4) Generally accepted standards of medical practice. (5) Treatments that are likely to provide a benefit[.]" *Id.* § 1374.33(b).

February 2014. Dr. Kleis noted that after her psychiatric hospitalizations in the summer of 2014, E.K. was placed on medication that "kept her stable enough that she finished 7th grade in June 2015." Shortly thereafter, explained Dr. Kleis, E.K's "aggravated mood, physical assaultiveness, severe oppositionality, and risky behaviors, especially in sexual areas, worsened and she was no longer safe to have at home," which "necessitated" placement at Aspiro and Maple Lake.

The DMHC contracted with Maximus to conduct the review. On January 31, 2017, the DMHC sent plaintiffs a letter upholding Blue Shield's determination that E.K.'s stay at Aspiro was not medically necessary. The letter noted E.K.'s various diagnoses and her history of reporting suicidal ideation. Maximus also observed that E.K. was cooperative in treatment and her behavior had improved. In addition, Maximus observed that the records submitted did not indicate that E.K. had previously attempted outpatient treatment or in-home therapy, which were less restrictive options "considered first lines of care."

### F. Blue Shield's Denials of E.K.'s Maple Lake Claims

#### *1. Initial Review by Blue Shield*

While plaintiffs were challenging Blue Shield's denials of E.K.'s Aspiro claims, Blue Shield also denied plaintiffs' claims for E.K.'s stay at Maple Lake on the basis that they lacked medical necessity. As with the denial of the Aspiro claim, Blue Shield's internal notes state that a Blue Shield medical director reviewed the claim, medical records, and the MCG Care Guidelines, and found that E.K. was not experiencing thoughts of harming herself or others, that is, any such thoughts occurred in the past; had no problems requiring around-the-clock care; and was able to manage the basic activities of life. Blue Shield concluded that E.K.'s care could have been provided in outpatient treatment or an intensive outpatient program. Blue Shield again communicated its determination to plaintiffs through "explanation of benefits" letters, which stated that E.K.'s stay at Maple Lake was not medically necessary and that the guidelines and criteria relied upon by Blue Shield would be provided upon request.

#### *2. Second Review by Blue Shield, Magellan Health, and AMR; Independent Medical Review by Maximus*

Thereafter, plaintiffs submitted a complaint to the DMHC, which was treated as a request

for an IMR. In connection with their complaint, plaintiffs again submitted additional documentation, including the letters from Drs. Tazeau and Kleis. In response, Blue Shield enlisted Magellan Health to conduct a review of E.K.'s case notes and medical records. The reviewer found the clinical information did not appear to meet its medical necessity criteria, as E.K. did not demonstrate suicidal or homicidal ideation, had no medical instabilities, and had no other condition posing a serious risk to herself or others requiring 24-hour monitoring.

Blue Shield also referred the case to AMR. The AMR report notes that while a psychiatric evaluation had been completed, it was not available for review. The report also states that the amount of time E.K. spent in treatment at Aspiro was not noted, the record did not include any notes from Aspiro, and E.K.'s clinical information indicated no history of treatment prior to her stay at Aspiro, no suicidal or homicidal ideations, and no aggressive or destructive behavior. The reviewers, a psychiatrist and a pediatric physician, then applied the Child and Adolescent Level of Care Utilization System ("CALOCUS") Guidelines, which set forth six different dimensions that are scored on a scale from 1 to 5, with a score of 23 or higher considered consistent with residential treatment. E.K received the following scores: 1 for Dimension I (Risk of Harm); 3 for Dimension II (Functional Status); 3 on Dimension III (Comorbidity); 1 for Dimension IV's sub-score for Recovery Environment, and 2 for Dimension IV's sub-score for Environmental Support; and 3 for Dimension V (Resiliency and Response to Services). The reviewers did not provide any score for Dimension VI. E.K.'s total score was 13.[3] The report was completed on May 5, 2017.

The same day, Dr. Ocepek sent plaintiffs a letter upholding Blue Shield's claims denial. Citing to the "2016 Mental Health Service Administrator (MHSA) guideline" and the CALOCUS Guidelines, and quoting extensively from the AMR report, Dr. Ocepek stated that E.K.'s stay at

---

[3] Maximus requests judicial notice of the CALOCUS guidelines. (Dkt. No. 92-2.) Federal Rule of Evidence 201(b) permits judicial notice of facts "not subject to reasonable dispute" if they "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The CALOCUS guidelines were developed by the American Association of Community Psychiatrists and the American Academy of Child and Adolescent Psychiatry, then refined by the Child and Adolescent Service Intensity Instrument. The guidelines are readily available online through a variety of health services organizations. The request for judicial notice thus is GRANTED.

1  Maple Lake was not "medically necessary."

2  Maximus, the IMR engaged by the DMHC, reached the same conclusion. In a letter sent to plaintiffs, Maximus noted that it had reviewed E.K.'s medical records from throughout and after her stay at Maple Lake, the letters from E.K.'s parents, and the relevant medical literature. The reviewer applied the CALOCUS guidelines and gave E.K a composite score of 17. The DMHC informed plaintiffs that it adopted Maximus' determination.

### 3. *Second Independent Medical Review by Maximus*

Several months later, plaintiffs submitted a formal IMR request to the DMHC. In their September 5, 2017 letter, plaintiffs challenged the denial of their claims based on the Magellan Guidelines, arguing that Blue Shield did not explain why E.K.'s treatment did not meet the required criteria. Plaintiffs also critiqued AMR's application of the CALOCUS guidelines and claimed that AMR appeared to have rounded down E.K.'s scores. Plaintiffs further requested that the DMHC ask Blue Shield to provide plaintiffs with certain information and documents, including the guidelines used to evaluate plaintiffs' claims.

Maximus conducted a second IMR review and determined that Blue Shield's denial of plaintiffs' claims for E.K.'s stay at Maple Lake should be upheld. The Maximus reviewer considered E.K.'s medical records from 2012 through the end of E.K.'s stay at Maple Lake, letters from E.K.'s parents, email correspondence, and letters from several of E.K.'s treating providers, as well as the relevant medical literature. The second Maximus reviewer also elected to apply the CALOCUS guidelines and found the records supported a composite score of 19. On December 28, 2017, the DMHC sent plaintiffs a letter adopting Maximus' determination.

## II.  APPLICABLE STANDARDS

The parties agreed at the hearing on the motion that an abuse of discretion standard applies to the Court's review of Blue Shield's denial of plaintiffs' claims.[4] A party abuses its discretion

---

[4] The parties have filed cross-motions for judgment under Federal Rule of Civil Procedure 52. Generally, however, Rule 52 applies where a court must perform a de novo review of an ERISA benefit claim denial. Where, as here, a court applies an abuse of discretion standard, courts frequently treat parties' motions as ones for summary judgment under Rule 56. *See Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir. 1999), overruled on other grounds in *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 966–69 (9th Cir. 2006) ("When the decision

10

with respect to a claim denial "if it renders a decision without any explanation, construes provisions of the plan in a way that conflicts with the plain language of the plan, or fails to develop facts necessary to its determination." *Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. Of Trustees*, 588 F.3d 641, 649 (9th Cir. 2009). "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits. It means only that the plan administrator's interpretation will not be disturbed if reasonable." *Pacific Shores Hospital v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir. 2014) (quoting *Conkright v. Frommert*, 559 U.S. 506, 521 (2010)). Where the abuse of discretion standard applies, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 706 (9th Cir. 2012).[5]

### III. ANALYSIS

#### A. Plaintiffs' Claim Against Blue Shield

##### 1. *Magellan Guidelines and Generally Accepted Standards of Care*

As a threshold matter, the Court addresses plaintiffs' contention that the Magellan Guidelines do not reflect generally accepted standards of care because they focus on crisis stabilization rather than effective treatment of underlying and co-morbid conditions.[6]

---

to grant or deny [ERISA] benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court[.]"); *Lee v. Kaiser Found. Health Plan Long Term Disability Plan*, 812 F. Supp. 2d 1027, 1032 n.2 (N.D. Cal. 2011) ("If abuse of discretion applies, the Court will treat the parties' motions as ones for summary judgment under Rule 56."); *Gorbacheva v. Abbott Labs. Extended Disability Plan*, 309 F. Supp. 3d 756, 766 (N.D. Cal. 2018) ("Because the abuse of discretion standard applies, the Court rejects Plaintiff's argument that Rule 52 instead of Rule 56 [] applies."); *Gallupe v. Sedgwick Claims Mgmt. Servs. Inc.*, 358 F. Supp. 3d 1183, 1190 (W.D. Wash. 2019) ("Where review is *de novo*, a Rule 52 motion appears to be the appropriate mechanism for resolving the dispute. . . . However, where review is for abuse of discretion, it appears that Rule 56 is the appropriate "conduit to bring the legal question before the district court."). Thus, the Court construes the arguments made in the cross-motions as if they were made under Rule 56.

[5] On reply, plaintiffs suggest that a de novo standard may apply. However, given the parties' earlier stipulation and plaintiffs' failure to present persuasive evidence of a "gross deviation" from Plan terms that would warrant de novo review, abuse of discretion applies.

[6] At the hearing on the motion, plaintiffs' counsel agreed that the CALOCUS Guidelines, if properly applied, reflect reasonable standards of care. The Court thus focuses its review on the Magellan Guidelines.

11

In support of their argument, plaintiffs primarily rely on *Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019). In *Wit*, plaintiffs whose mental health benefit claims had been denied filed a class action against United Behavior Health challenging its use of the Optum Guidelines. *Id*. at *1. After a 10-day bench trial that elicited testimony from several mental health experts, the *Wit* court concluded that the Optum Guidelines are not consistent with any generally accepted standards of care because, among other flaws, there is an "excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions." *Id*. at *1, 14-17. Plaintiffs assert that the Magellan Guidelines are virtually identical to the Optum Guidelines, and thus, fail for the same reason.

The Court declines to extend the factual findings of *Wit* here. Unlike the court in *Wit*, this Court does not have before it the kind of expert testimony and other evidence necessary to decide whether *these* guidelines, in the context of *this* Plan, are improper. Nor can the Court conclude that the Magellan Guidelines are identical to the Optum Guidelines with respect to the emphasis on acuity. While the two sets of guidelines contain similarities, there are notable distinctions.[7]

Because there is insufficient evidence before the Court to demonstrate that the Magellan Guidelines fall below generally accepted standards of care, the Court proceeds to consider whether Blue Shield abused its discretion in its application of these and other guidelines to plaintiffs' claims.[8]

//

---

[7] For example, in *Wit*, the court highlighted the "[n]umerous other words and phrases [] used in the Guidelines to refer to the acute symptoms that cause a member to seek treatment, including 'presenting symptoms,' 'presenting problems,' 'presenting condition,' and factors 'leading to' or 'precipitating' admission," as well as the "why now" concept. *Id*. at *23-26. Except for "leading to," none of these terms appear in the Magellan Guidelines.

[8] Plaintiffs also argue, more generally, that Blue Shield's level of care guidelines fall below generally accepted standards because they treat residential treatment as appropriate only as a last resort after all lesser levels of care have failed. However, plaintiffs point to no specific provision of the Magellan Guidelines that violate this standard. Further, the Court notes that the Plan expressly provides that "medically necessary" services are those that are "furnished at the most appropriate level which can be provided safely and effectively to the patient," and "[i]f there are two or more medically necessary services that may be provided for the illness, injury or medical condition, Blue Shield will provide benefits based on the most cost-effective service."

### 2. *Blue Shield's Denials of the Aspiro and Maple Lake Claims*

Plaintiffs raise myriad challenges to Blue Shield's denials of the Aspiro and Maple Lake claims. The Court considers each in turn.

First, plaintiffs argue that Blue Shield improperly farmed out the reviews and simply rubberstamped third parties' analyses in denying plaintiffs' claims. The Plan expressly states, however, that "Blue Shield of California may use the services of Doctor of Medicine consultants, peer review committees of professional societies or Hospitals and other consultants to evaluate claims." Further, while the denial letters rely heavily on the analysis of AMR and Magellan Health, there is evidence throughout the record suggesting Blue Shield was more than minimally involved in reviewing plaintiffs' claims. Blue Shield's internal notes state that directors at the company reviewed the plaintiffs' claims and medical records, as well as applicable guidelines, in the course of initial reviews. On appeal, clinical case review forms completed by a registered nurse from Blue Shield cite to and quote from E.K.'s medical records. In addition, while Blue Shield's denial letters are dated shortly after the AMR reports, the Court cannot conclude, based on the evidence before it, that Dr. Ocepek did not adequately review all relevant materials before issuing the denials.[9]

Second, plaintiffs argue that Blue Shield caused confusion and conveyed misinformation by failing to identify properly the guidelines used to deny the claims. This argument, too, fails to persuade. The letters denying the Aspiro and Maple Lake appeals explicitly referenced the "Blue Shield of California/MHSA guidelines for treatment at a residential program."[10] The AMR report attached to the Aspiro denial, while not naming the Magellan Guidelines, listed the criteria used in AMR's assessment, which correspond to the Magellan Guidelines. The AMR report attached to

---

[9] Relatedly, plaintiffs argue that claim denial letters were cursory because they failed to accurately state all of E.K.'s diagnoses. The portion of the letter plaintiffs identify, however, is merely a summary. Further, in light of Blue Shield's internal notes and clinical case forms, the Court cannot conclude that Blue Shield only considered the diagnoses referenced in the claim denial letters.

[10] The plan defines "Mental Health Service Administrator (MHSA)" as "a specialized health care service plan licensed by the California Department of Managed Health Care" with whom Blue Shield contracts "to underwrite and deliver Blue Shield's Mental Health and Substance Abuse Services through a separate network of MHSA Participating Providers."

13

1  the Maple Lake denial cited the CALOCUS Guidelines.  Moreover, in its explanation of benefits
2  letters and its claim denial letters, Blue Shield offered to provide plaintiffs with the relevant
3  guidelines upon request.  There is no evidence in the record, nor do plaintiffs assert, that they ever
4  made such a request.[11]  Blue Shield's process, while sloppy at times,[12] does not rise to the level of
5  an abuse of discretion.[13]

6        Third, plaintiffs argue that Blue Shield's claim denials were incorrect because they did not
7  consider certain facts or relied on erroneous facts, namely, those related to E.K.'s history of
8  suicidal ideations and history of treatment.

9        In the Aspiro denial letter, Blue Shield, quoting from the AMR report, noted "an absence
10 of suicidal and homicidal ideation."  Likewise, the Maple Lake denial letter, again quoting AMR,
11 stated that E.K. had "no history of . . . suicidal or homicidal ideation, or aggressive or destructive
12 behavior."  Plaintiffs argue that these conclusions are contradicted by medical records from E.K.'s
13 Section 5150 hold, which references suicidal comments and gestures, and the school evaluation
14 completed prior to her residential treatment, which reports cutting and threats made towards
15 others.  As the parties agreed at the hearing on the motion, however, suicidal ideations, like many
16 other conditions, fall on a spectrum.  In other words, E.K.'s history of cutting and expressing
17 suicidal thoughts, which were noted in the Aspiro denial letter, do not necessarily rise to the level

---

[11] Plaintiffs' appeal of the Aspiro claim denial requested that Blue Shield "provide [] detailed, specific references to information relied upon which indicates the treatment [E.K.] received was not medically necessary."  While plaintiffs requested a more fulsome explanation for the denial, it is not clear that plaintiffs were requesting copies of the guidelines used.

[12] Blue Shield's internal notes from its initial reviews state that the reviewers consulted the "MCG Care Guidelines."  At the hearing on the motion, Blue Shield's counsel surmised that these may have been typographical errors, as "MCG" is the acronym typically used to refer to another set of guidelines called the Milliman Guidelines.  Even if true, these errors do not suffice to show an abuse of discretion.  There is no indication that plaintiffs knew about any references to "MCG" or the Milliman Guidelines prior to initiating this case, and thus, plaintiffs could not have been confused about these internal notes during the claims review process.  Further, these errors do not suffice to establish an abuse of discretion on the merits of the claims.

[13] Nor does Blue Shield's use of guidelines itself conflict with the plain language of the plan.  Although the plan defines "medical necessity," it does so in general terms and does not preclude use of more specific guidelines to reach a determination.  *See Brian H. v. Blue Shield of Cal.*, Case No. 17-cv-03095-MMC, 2018 WL 5778318, at *2 (N.D. Cal. Nov. 1, 2018) (finding that "nothing in the Plan precludes Blue Shield from applying the 'Magellan Medical Necessity Criteria Guidelines' in determining whether services are 'medically necessary' under the Plan").

14

of suicidal ideations.  There is no evidence that E.K. made specific plans to harm herself or others, and on one occasion, she told doctors that her comments about suicide were a joke.  Moreover, the behaviors that led to her Section 5150 hold occurred more than one year before she began treatment at Aspiro, and the school evaluation was completed about five months before she began this treatment.[14]  While the Court understands that any mention of suicide from an adolescent may be troubling, and although Blue Shield could have better served plaintiffs by explaining its findings on this issue, the Court cannot conclude based on the administrative record that E.K. had suicidal ideations rendering Blue Shield's contrary finding an abuse of discretion.

With respect to the claim in the Maple Lake denial letter that E.K. had "no history of prior treatment, other than at [Asprio]," there is evidence in the record that appears to contradict this statement.  Namely, E.K. received some treatment on an outpatient basis before entering Aspiro, including by Drs. Tazeau and Kleis.  However, the question before the Court is whether this statement in the denial letter evidences an abuse of discretion by Blue Shield.  Here, while plaintiffs argue that outpatient therapy had not worked, they do not dispute that E.K. never attempted other forms of *intensive* mental health treatment, such as an intensive outpatient program or partial hospitalization, prior to beginning residential treatment.[15]  There is no evidence in the record that these interim forms of treatment would not have been equally safe and effective as residential treatment.  Further, the portion of the Maple Lake denial letter stating that E.K. had not received treatment prior to entering Aspiro quoted directly from the AMR report.  Even assuming AMR overlooked evidence of prior treatment, there is no evidence that Blue Shield,

---

[14] Plaintiffs make much of Blue Shield's finding that any suicidal comments or gestures are too remote in time to support a finding of medical necessity, arguing that Blue Shield violates *Wit* by requiring an individual to be on the brink of suicide to qualify for coverage.  However, as explained, this Court is not bound by the factual findings in *Wit*.  Moreover, plaintiffs do not dispute that *some* temporal requirement may be justified, nor do they offer any explanation for why the timing of E.K.'s suicidal comments and gestures warrant residential treatment.

[15] Mental health conditions generally are treated in a range of settings referred to as "levels of care."  Five commonly recognized levels of care, from most to least restrictive, are (1) inpatient treatment, (2) residential treatment, (3) partial hospitalization treatment, (4) intensive outpatient treatment, and (5) general outpatient treatment. "Residential Care," at issue here, is defined in the Plan as "Mental Health Services provided in a facility or a free-standing residential treatment center that provides overnight/extended-stay services for Members who do not require acute Inpatient care."

15

which was the ultimate decisionmaker with respect to the claim, made the same mistake. Plaintiffs have not demonstrated that Blue Shield relied on erroneous findings of fact in determining E.K.'s residential treatment was not medically necessary.

Fourth, plaintiffs argue that Blue Shield failed to credit or distinguish the evidence and opinions of E.K.'s treating providers, Drs. Tazeau and Kleis. While reviewers "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," they are not required "to accord special weight to the opinions of a claimant's physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823–24 (2003). Here, Dr. Tazeau saw E.K. less than once per week over five months, concluding six months before E.K. entered residential treatment. Dr. Tazeau's letter stated that she believed residential treatment would be "beneficial," not necessary. Further, while Dr. Kleis' letter represented that E.K.'s behaviors "necessitated" residential treatment, the letter did not state how long or how often Dr. Kleis treated E.K., nor did it provide specific examples of "assaultiveness" or "oppositionality" that justified his recommendation.[16] Notes from E.K.'s treatment providers at Aspiro were summarized in reasonable detail in Blue Shield's clinical case review forms. In short, there is no evidence that reviewers refused to credit the opinions of treating physicians (as opposed to finding countervailing evidence more persuasive), let alone that they did so "arbitrarily."

Finally, plaintiffs take issue with the CALOCUS analysis performed by AMR[17] and incorporated into Blue Shield's denial of the Maple Lake claim, which plaintiffs contend should have yielded a composite score of at least 24. On each of the seven dimension of the CALOCUS Guidelines, plaintiffs argue that AMR either ignored evidence—specifically, E.K.'s history of suicidal thoughts, impulsive and abusive behavior, and physical and medical deficits—or should have reached a different conclusion based on the evidence reviewed. As explained, however, the Court is not persuaded that AMR, or Blue Shield, as the entity with final discretion over the claim

---

[16] Plaintiffs submitted these letters in connection with its complaint regarding the initial Maple Lake denial, as well as in their request for Maximus' IMR regarding Aspiro. It does not appear that the letters were available to Blue Shield in its review of the Aspiro claim.

[17] The Court separately addresses Maximus, which also applied the CALOCUS Guidelines in its reviews of plaintiffs' claims.

16

denial, ignored evidence in the record that would have affected the outcome of plaintiffs' claims. Further, disagreeing with AMR or Blue Shield's findings does not establish an abuse of discretion where Blue Shield's conclusions ultimately were reasonable. Here, it is significant that two different third party reviewers (AMR and Maximus) applied the CALOCUS Guidelines three different times, and although the composite scores increased with each review, even the high score of 19 fell well short of the 23 required to warrant residential treatment. Moreover, the dimension-by-dimension analysis was similar in all three reviews, with the exception of AMR's review of Dimension VI, for which it did not render a score because even the maximum number on that dimension would not have yielded a composite score of 23.

In sum, the Court finds that Blue Shield did not abuse its discretion in denying plaintiffs' claims related to E.K.'s residential treatment at Aspiro and Maple Lake. Accordingly, Blue Shield is entitled to judgment as to the claim against it.

### B. Plaintiffs' Claim Against TriNet

In its cross-motion, TriNet also argues that it is entitled to judgment because plaintiffs' motion does not address TriNet or argue that TriNet is responsible for any of the claim denials. In response, plaintiffs contend that regardless of whether TriNet engaged in any wrongdoing, it could be liable for an improper claim denial under ERISA because it is "the Plan." *See* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought (1) by a participant of beneficiary . . . to recover benefits due [to the participant] under the terms of the plan, to enforce [the participant's] rights under the plan[.]"); 29 U.S.C. § 1132(d)(1) ("An employee plan may sue or be sued under this subchapter as an entity."). Plaintiffs emphasize that in *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202 (9th Cir. 2011), an en banc panel of the Ninth Circuit held that nothing in ERISA limited the universe of parties who could be sued under section 1132(a)(1)(B).

Plaintiffs' authorities stand for the proposition that TriNet, as Plan administrator *could be* held liable in a civil enforcement related to the denial of benefits. As the *Cyr* court noted, however, "[i]t is not enough to identify a plan administrator as a potential defendant. . . . [T]he plan administrator can be an entity that has no authority to resolve benefit claims or any responsibility to pay them." *Id*. at 1207. As such, the Court must consider whether "individual

17

1   liability is established" and who is "a logical defendant for an action . . . to recover benefits due

2   . . . under the terms of the plan[.]" *Id.*  Here, plaintiffs have presented no evidence regarding

3   TriNet's role in relation to plaintiffs' claims, let alone that TriNet may be held liable even if the

4   claims against Blue Shield fail.  TriNet is entitled to judgment in its favor.

### C. Plaintiffs' Claim Against Maximus

Plaintiffs and Maximus also bring cross-motions for judgment as to the breach of fiduciary duty claim arising out of Maximus' IMRs.  As a threshold matter, the Court must revisit an issue central to its decision at the motion to dismiss stage, namely, whether plaintiffs have established that Maximus was a functional fiduciary.  The central inquiry when determining whether a party is a functional fiduciary is whether it was acting as an ERISA fiduciary "when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

As Maximus points out, at the motion to dismiss stage, the Court was required to accept as true plaintiffs' allegation that Maximus exercised discretionary authority and control over the disposition of Plan assets to plaintiffs.  To prevail on a motion for judgment, however, plaintiffs must put forth evidence to support this claim.  Maximus argues that there is no evidence that it was a functional fiduciary, and specifically, (1) neither the Plan nor any other contract establishes a fiduciary relationship between the Maximus and the Plan; (2) Maximus is a government contractor paid by the DMHC to conduct IMRs pursuant to state law, and by statute, cannot have a financial relationship with Blue Shield; (3) Maximus does not act on behalf of any ERISA plan, including the one at issue here; and (4) the Affordable Care Act requires California to contract with external independent review organizations like Maximus to perform IMRs whose decisions regarding medical necessity are then binding on the health insurer.

Plaintiffs' response is unpersuasive.  First, plaintiffs counter that the Court already determined that Maximus acted as a functional fiduciary when it conducted the IMRs of E.K.'s claims.  As explained, however, the Court's decision at the motion to dismiss stage was based on the allegations in the complaint, and the Court is not bound by this decision on the motion for judgment.

Second, plaintiffs emphasize that Maximus determined whether to uphold or overturn the

claim denial, and its decision was final and binding on Blue Shield. Thus, plaintiffs argue, Maximus "exercised discretionary authority and control over the disposition of Plan assets to Plaintiffs." This conclusory argument, too, is unpersuasive. Plaintiffs requested IMRs from the DMHC, which referred the requests to Maximus. Maximus performed the reviews under its contract with the DMHC. The record shows Maximus made determinations regarding the medical necessity of residential treatment by applying medical criteria, but it did not render actual coverage decisions requiring interpretation of the Plan. The DMHC approved and transmitted the agency's final decision to plaintiffs, noting that although its decision was final, plaintiffs should "refer to [their] health plan's Evidence of Coverage (EOC) or contact [their] health plan" to determine whether they had "the right to submit an appeal to another department or agency." The DMHC's decision was binding on Blue Shield only because the law so provides. Plaintiffs provide no actual evidence to the contrary.[18]

Because plaintiffs have not established that it was a functional fiduciary, Maximus is entitled to judgment in its favor.

## IV. CONCLUSION

Cases such as these where the mental health of an adolescent is at issue are always difficult. Nonetheless, based upon the law as set forth herein, plaintiffs' motion for judgment is **DENIED** as to all defendants. Blue Shield and TriNet's cross-motion for judgment is **GRANTED**. Maximus' cross-motion for judgment is **GRANTED**. No later than **August 14, 2020**, the parties shall jointly file a proposed form of judgment approved as to form.

This Order terminates Docket Numbers 89, 90, 92, 94, 96, and 108.

**IT IS SO ORDERED.**

Dated: August 6, 2020

*[signature]*
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[18] As an alternative to judgment, plaintiffs request that the Court grant them leave under Rule 56(d) to conduct further discovery as to Maximus. Plaintiffs contend that "while not dispositive," the relatively low rate of Maximus' reversals of claim denials, discovered through limited discovery on Maximus, provide evidence to warrant additional discovery. The Court disagrees. Maximus' overturn rates, by themselves, do not persuade the Court that plaintiffs could establish a functional fiduciary relationship with additional discovery.